Simon J. PINHAS, Plaintiff–Appellant,

v.

SUMMIT HEALTH, LTD.; Midway Hospital Medical Center; the Medical Staff of Midway Hospital Medical Center; Mitchell Feldman, et al., Defendants–Appellees.

No. 87–6530.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 1989.

Decided July 26, 1989.

J. Mark Waxman, Weissburg and Aronson, Inc., Los Angeles, Cal., for defendants-appellees.

Before CANBY, WIGGINS and O'SCANNLAIN, Circuit Judges.

WIGGINS, Circuit Judge:

Appellant Dr. Simon J. Pinhas appeals the dismissal of his action challenging the removal of his staff privileges at Midway Hospital Medical Center (Midway) in Los Angeles. Pinhas alleges claims under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982) and 42 U.S.C. §§ 1983, 1985(3) (1982). Pinhas also seeks a declaratory judgment that Cal.Bus. & Prof.Code §§ 805, 805.5 (West Supp.1989), and the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101–11152 (Supp. IV 1986), are unconstitutional under the fourteenth amendment. The district court granted appellees' motion to dismiss all four claims. We reverse the dismissal of the antitrust claim, and affirm the dismissal of the section 1983 claim and request for declaratory judgment.[1]

I

BACKGROUND

Dr. Pinhas is an eye physician and ophthalmological surgeon. He became a member of the medical staff at Midway in October 1981. Reimbursement under Medicare for the charges of an assistant surgeon in the performance of eye surgery became unavailable in February 1986. Pinhas alleges that most hospitals in Los Angeles subsequently eliminated their requirement that assistant surgeons be utilized during eye surgeries. Pinhas, together with several other ophthalmic surgeons at Midway, petitioned the medical staff at Midway to eliminate its assistant surgeon requirement. The medical staff refused to do so. Pinhas advised the hospital administration that the medical staff's refusal to eliminate the assistant surgeon require-

Lawrence Silver, Steven L. Rayman, Blecher & Collins and Maxwell Blecher, Beverly Hills, Cal., for plaintiff-appellant.

---

1. Pinhas does not challenge the dismissal of the    section 1985(3) claim on appeal.

ment would cost him approximately $60,000 per year. Pinhas allegedly told the hospital that although he wished to keep the majority of his practice at Midway, he would nevertheless move his practice if the assistant surgeon requirement was not abolished. Pinhas alleges that rather than abolish the assistant surgeon requirement, Midway offered him what he characterizes as a "sham" contract in which he was to be paid the sum of $36,000 per year (later raised to $60,000 per year) for consulting services he contends he would not have been expected to perform. Pinhas refused to sign the contract. Despite repeated requests by appellees Dr. Lurvey, the Chief of Staff at Midway, and Mitchell Feldman, regional vice-president of Summit Health Ltd. (Summit), the parent corporation of Midway, Pinhas refused to return the contract.

Pinhas contends that as a result of his refusal to return the contract, Lurvey and Feldman conspired to initiate disciplinary proceedings against him. By letter dated April 13, 1987, Pinhas was advised by Summit Health and Midway, through Lurvey and Feldman, that he was summarily suspended as of that date. The letter stated that he was being suspended based on a "medical staff review of Dr. Pinhas's medical records, with consideration as to the questions raised regarding: indications for surgery; appropriateness of surgical procedures in light of patient's medical condition; adequacy of documentation in medical records; and ongoing pattern of identified problems." The letter also indicated that the Midway Executive Committee (MEC) would convene within ten days to review and consider the action. The MEC met on April 20, 1987, and permitted Pinhas to make a statement. The MEC upheld the summary suspension with the recommendation to terminate his staff privileges at Midway. Midway's board of directors concurred with the MEC's recommendation.

In accordance with the medical staff bylaws, Pinhas requested a hearing by the Midway Judicial Review Committee (JRC).

He was granted the hearing and received notice of seven charges against him. In accordance with the bylaws, Lurvey appointed seven members of the medical staff to serve on the JRC. Attorney Richard Posell was selected by Midway's attorney Mark Kadzielski of Weissburg & Aronson to serve as the hearing officer. The peer-review hearings began on May 26 and proceeded for six hearing sessions, concluding on June 12, 1987. Both parties were permitted to call witnesses and introduce evidence. Pinhas was not permitted representation by legal counsel prior to or during the proceedings. The JRC issued its report on June 12, 1987, upholding only one of the seven charges against Pinhas. It recommended that Pinhas be reinstated subject to Pinhas's agreement to several special conditions relating to the conduct of his operations and to be placed on a six-month probationary period.

The MEC and Pinhas both appealed the JRC's decision to the Governing Board of the hospital in July 1987. On February 2, 1988, the Governing Board affirmed the decision of the JRC, but imposed more stringent conditions upon Pinhas's six-month probationary period. Finally, sometime in October 1988, Pinhas filed a petition for writ of mandate pursuant to Cal.Civ. Proc.Code § 1094.5 (West Supp.1989). No decision has yet been reached in that matter.

On May 21, 1987, following his suspension, but before the hearing before the JRC, Pinhas filed this suit in federal court. Named as defendants are Summit Health; Midway; the Midway medical staff; Dr. Lurvey; Feldman; Drs. Reader, Macy, Salz, and Perlman, each of whom are ophthalmologists and competitors of Pinhas; Peggy Farber, an employee in the risk management section with Summit Health/Midway; Kadzielski; Weissburg & Aronson; and Posell (collectively "appellees").[2] Pinhas alleges in his complaint that as a result of his refusal to sign the "sham" contract, appellees entered into a

---

2. Also named as a defendant was the California Board of Medical Quality Assurance (BMQA).

BMQA, however, was dismissed by stipulation.

conspiracy to preclude him from practicing at Midway or any other hospital in California or the rest of the United States in violation of section one of the Sherman Act, 15 U.S.C. § 1 (1982). The thrust of Pinhas's antitrust claim is that appellees conspired summarily to suspend and terminate his medical staff privileges at Midway, and to have the report of his termination disseminated to hospitals in California pursuant to Cal.Bus. & Prof.Code §§ 805, 805.1 (West Supp.1989), and to hospitals throughout the entire country pursuant to 42 U.S.C. §§ 11133, 11135 (Supp. IV 1986) in order to preclude him from practicing elsewhere. Section 805 of the California Business and Professions Code requires a health care facility to report actions adversely affecting a doctor's clinical privileges to the California Board of Medical Quality Assurance (BMQA). Before granting or renewing a staff privilege for a physician or surgeon, a health care facility is also required under section 805.5 to request a report from BMQA to determine whether the applying doctor has been denied staff privileges by another hospital.[3] Similar reporting requirements are mandated by federal law under 42 U.S.C. §§ 11133, 11135. Pinhas contends that as a result of his termination and the dissemination of the reports, appellees have effectively boycotted his practice and precluded him from continued competition in the marketplace.

Pinhas also alleges under sections 1983 and 1985(3) that the peer-review proceedings did not comport with the due process guarantee of the fourteenth amendment. In support of his due process claim, Pinhas contends he did not receive adequate notice of the charges against him, he was not permitted legal counsel at the hearing, the hearing officer Posell was biased, he was not permitted to cross-examine the MEC's witnesses and was precluded from calling several of his own. In addition to his antitrust and civil rights claims, Pinhas requests a declaratory judgment that Cal. Bus. & Prof.Code §§ 805, 805.1 and 42 U.S. C. §§ 11133, 11135 violate the equal protec-

tion and due process clauses of the fourteenth amendment.

Appellees filed a motion to dismiss on August 4, 1987, and the court dismissed the case on September 21, 1987. The district court concluded that the appellees were protected from antitrust liability under the state action doctrine pursuant to *Patrick v. Burget*, 800 F.2d 1498 (9th Cir.1986), *rev'd*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). The court dismissed the civil rights claims because of a lack of state action under the fourteenth amendment. It dismissed the claim for declaratory relief as not ripe, and also because the appellees were not the right parties to defend either the state or federal statute. Pinhas's request for reconsideration by the court based on the filing of certiorari with the Supreme Court in *Patrick* was denied. Pinhas appeals dismissal of his antitrust and section 1983 claims, as well as his request for declaratory relief. He does not appeal the dismissal of his section 1985(3) claim. We have jurisdiction under 28 U.S.C. § 1291 (1982).

## II

### STANDARD OF REVIEW

A dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is a ruling on a question of law that we review de novo. *See Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir. 1984). Review is limited to the contents of the complaint, *see id.*, and the complaint should not be dismissed under the rule "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987).

"The customary deference for the district court is not applicable to its determi-

---

**3.** Failure to file a report under section 805, or to request one under section 805.1, constitutes a

misdemeanor. Cal.Bus. & Prof.Code §§ 805(e), 805.5(c).

nation to grant a declaratory judgment. The court of appeals must exercise its own sound discretion to determine the propriety of the district court's grant or denial of declaratory relief." *United States v. Washington*, 759 F.2d 1353, 1356–57 (9th Cir.) (en banc) (citations omitted), *cert. denied*, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed. 2d 358 (1985); *accord Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir.1986) (the court reviews the denial of declaratory relief de novo).

## III

### ANALYSIS

#### A. *Antitrust Claim*

Pinhas contends on appeal that the district court's dismissal of his antitrust claim based on the state action doctrine must be reversed in light of the Supreme Court's recent decision reversing our decision in *Patrick*. *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). Appellees contend that the Supreme Court's decision in *Patrick* does not alter the district court's holding, but that even if the state action doctrine does not apply, Pinhas's amended complaint does not state a viable antitrust claim because Pinhas's claim was not ripe for determination and the complaint fails to demonstrate the required nexus with interstate commerce, plead sufficient facts to establish injury to competition, and adequately plead an antitrust conspiracy.

#### 1. State Action

#### a. *Patrick*

In *Patrick* we considered whether the state action doctrine protected physicians in Oregon from federal antitrust liability for their involvement with hospital peer-review proceedings. The facts in *Patrick* are similar to those of this case. The plaintiff, a general and vascular surgeon, was subjected to a review of his staff privileges at a hospital in Astoria, Oregon, whereupon it was recommended that his privileges be terminated. 800 F.2d at 1502. The doctor brought suit in federal court while the hospital's peer-review proceedings were still

being conducted, alleging claims under sections 1 and 2 of the Sherman Act. *Id.* at 1504. He alleged that the members of his former clinic initiated the hospital peer-review proceedings to preclude him from competing against them. *Id.* at 1502–04. We held that the doctors' conduct in the peer-review proceedings was immune from antitrust scrutiny under the state action doctrine because Oregon had articulated a policy in favor of peer review and actively supervised the peer-review process. 800 F.2d at 1505–07. The Supreme Court reversed our decision, holding that the state action doctrine did not shield the hospital peer-review proceedings from an antitrust challenge. 108 S.Ct. at 1665–66.

In considering the state action doctrine, the Court applied the rigorous two-prong test first devised in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). *Patrick*, 108 S.Ct. at 1662–63. Under the *Midcal* test, " 'the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy," ' " and "the anticompetitive conduct 'must be "actively supervised" by the State itself.' " *Id.* at 1663 (quoting *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943). The Court found it unnecessary to consider the "clear articulation" prong of the *Midcal* test, finding that the second prong was not satisfied. *Id.*

The Court stated that the "active supervision" or second requirement, "mandates that the State exercise ultimate control over the challenged anticompetitive conduct," and "requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Id.* The defendants argued that the state of Oregon actively supervised the peer-review process through (1) the state Health Division; (2) the Board of Medical Examiners (BOME); (3) and the state judicial system. *Id.* The Court had little difficulty in concluding that neither the Health Division nor the BOME actively supervised the peer-review decisions. *Id.* at 1663–64. The Health Division had gen-

eral supervisory powers over such matters as licensing hospitals and the endorsement of health laws. Although the statute authorizes the Health Division to compel a hospital to meet its obligation to establish and review peer-review *procedures,* the Court concluded that this authority was insufficient because the Health Division had no power to review actual peer-review *decisions* and overturn a decision that failed to accord with state policy. *Id.* at 1664. Similarly, the BOME, whose principal function was to regulate the licensing of physicians, also lacked the authority to disapprove individual peer-review decisions. *Id.*

With respect to the state judiciary, the Court declined to decide whether judicial review of private conduct can ever satisfy the active supervision requirement. "This case, however, does not require us to decide the broad question whether judicial review of private conduct ever can constitute active supervision, because judicial review of privilege-termination decisions in Oregon, if such review exists at all, falls far short of satisfying the active supervision requirement." *Id.* at 1664–65. The Court noted that there was no statute in Oregon, or any holding by a state court, which provided a physician whose privilege had been revoked by a hospital a means of judicial review of private peer-review decisions. *Id.* at 1665. The Court emphasized that any judicial review that did exist was insufficient to constitute "active supervision," because the review would not involve a review of the merits of a privilege termination decision. *Id.* (citing *Straube v. Emanuel Lutheran Charity Bd.,* 287 Or. 375, 384, 600 P.2d 381, 386 (1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980)). The Court thus concluded that no state actor in Oregon actively supervised hospital peer-review decisions and that the state action doctrine was inapplicable. *Id.*

b. *Application of Patrick*

██ Pinhas does not dispute that the first prong of the *Midcal* test is satisfied.

We therefore limit our analysis to the second prong. Appellees' arguments in support of their contention that California actively supervises the peer-review process mirror those made in *Patrick.* Appellees contend that the State Department of Health Services (SDHS), California Board of Medical Quality Assurance (BMQA), and the state judiciary all actively supervise the peer-review system.

The SDHS has substantively the same role in California as the Oregon State Health Division has in Oregon: the licensure and review of hospital procedures, including procedures for the review of staff decisions.[4] Also like the Oregon State Health Division, it has no authority to review privilege decisions and therefore does not actively supervise these procedures.

Similarly, the BMQA serves relatively the same role in California as the BOME in Oregon. Its primary function is the regulation and disciplining of physicians. *See* Cal.Bus. & Prof.Code §§ 2001–2006 (West Supp.1989). And, as in Oregon, any adverse action taken by a hospital agreement against a member physician must be reported to the BMQA. *See* Cal.Bus. & Prof. Code § 805 (West Supp.1989). Also like the BOME, the BMQA has no authority to review the outcome of a peer-review proceeding. Although it may not disseminate a report it finds to be without merit, this restriction does not constitute the type of active supervision necessary under *Patrick.*

We join the Supreme Court in avoiding the broad question whether state courts, acting in their judicial capacity, ever can adequately supervise private conduct for purposes of the state action doctrine. *See Patrick,* 108 S.Ct. at 1664–65. The judicial review that does exist in California does not satisfy the active supervision requirement.

Unlike Oregon, California is actively engaged in reviewing peer-review decisions.

---

**4.** Pursuant to its rule-making authority under Cal. Health & Safety Code § 1275, the SDHS has promulgated extensive regulations governing the operation of an acute care facility. *See* Cal.Admin.Code tit. 22, § 70701 *et seq.* (1982).

Such review is created by statute under Cal.Civil Proc.Code § 1094.5 (West Supp. 1989) (reviewing quasi-judicial decisions) and Cal.Civ.Proc.Code § 1085 (West 1980) (reviewing quasi-legislative administrative proceedings).[5] The plethora of cases cited by appellees demonstrate the willingness of California courts to entertain challenges to the peer-review process. The function of the trial and appellate courts, however, is limited under both types of proceedings.

> [Under Section 1094.5,] if the decision was substantively rational, lawful, not contrary to established public policy and the proceedings were fair, a court may not substitute a judgment for that of the governing board even if it disagrees with the board's decision. The scope of review in traditional mandamus proceedings [under section 1085] is limited to an examination of the record of the hospital proceedings to determine whether the action taken was substantively irrational, unlawful or contrary to established public policy or procedurally unfair.

*Hay v. Scripps Memorial Hosp.–La Jolla,* 183 Cal.App.3d 753, 758, 228 Cal.Rptr. 413, 417 (1986) (citations omitted). This limited form of review is similar to the standards applied by the Oregon courts that the Supreme Court found insufficient to constitute active supervision. *Patrick,* 108 S.Ct. at 1665. "Such constricted review does not convert the action of a private party in terminating a physician's privileges into the action of the State for purposes of the state action doctrine." *Id.*

We therefore find that the California judiciary does not actively supervise the peer-review process. Accordingly, the state action doctrine does not protect peer-review proceedings in California from application of the antitrust laws.

### 2. Reviewability

■ Appellees raise several arguments in support of the contention that we should decline to review the case at this time. The argument that the case is not ripe is frivolous because Pinhas has already been removed from Midway and an "805 Report" has been filed against him. Regardless of the outcome of the writ of mandamus action, Pinhas still has a viable antitrust claim. As is clear from the Supreme Court's decision in *Patrick,* that the peer-review proceedings were not yet complete when this suit was filed does not bar review of Pinhas's action. *See id.* 108 S.Ct. at 1661 (stating that case was filed during course of peer-review proceedings).

■ Appellees also appear to contend that Pinhas failed to exhaust his available administrative remedies. Initially, we are not convinced that the requirement of exhaustion of administrative remedies is applicable in this case because an administrative agency is not involved. The peer-review process is conducted by a private entity and is judicially reviewable in the California state courts. The reasons for giving deference to an agency, *see e.g., Morrison–Knudsen Co. v. CHG Int'l, Inc.,* 811 F.2d 1209, 1223 (9th Cir.1987), simply are not applicable here. In any event, where, as here, there is no statutory requirement of exhaustion of administrative remedies, application of the exhaustion doctrine lies within the discretion of the trial court. *See id.* The district court did not abuse its discretion by entertaining Pinhas's suit.

■ Appellees next argue that the doctrine of primary jurisdiction precludes review of Pinhas's suit while the peer-review proceedings remain ongoing. The primary jurisdiction doctrine "is applicable whenever the enforcement of a claim subject to a specific regulatory scheme requires resolu-

---

5. California law recognizes two types of mandamus review of the decisions made by hospitals with regard to physician medical staff privileges. Where a physician's medical staff privileges have been denied, suspended or terminated on the ground the physician has not demonstrated an ability to comply with established standards, that administrative decision is classified as "quasi-judicial" and review is

by administrative mandamus. However, where the physician has had privileges denied or curtailed because of the implementation of a "policy" of the hospital, the administrative action is classified as "quasi-legislative" and reviewable by traditional mandamus.
*Hay v. Scripps Memorial Hosp.–La Jolla,* 183 Cal.App.3d 753, 758, 228 Cal.Rptr. 413, 417 (1986) (citations omitted).

tion of issues that are 'within the special competence of an administrative body.' " *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 778 F.2d 1365, 1370 (9th Cir. 1985) (quoting *United States v. Western Pacific R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)). Again, we doubt the application of this argument where no agency action is directly involved. Nevertheless, the doctrine does not apply here because the proceedings at the state level, designed to determine whether Pinhas received a fair hearing, will not help clarify and narrow Pinhas's antitrust claims. *See* 6 J. Von Kalinowski, *Antitrust Laws & Trade Regulation* § 44A.01[2][b], at 44A–14 (1989) ("The doctrine of primary jurisdiction will not be invoked if it is clear that the agency's decision will have no bearing on the antitrust issues.").

■ Abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), is also inappropriate. *Burford* abstention is appropriate when a federal court is presented with "difficult questions of state law bearing on policy problems of substantial public import 'whose importance transcends the result in the case then at bar.' " *Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142, 1151 (9th Cir.1988) (quoting *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)). Application of the Sherman Act, in this case, does not involve difficult questions of state law.

Finally, appellees rely on *Mir v. Little Co.*, 844 F.2d 646 (9th Cir.1988), for the proposition that the court should abstain under principles of federalism and comity. In *Mir*, however, we concluded that a doctor's common-law claims against a hospital were precluded under California state law because the doctor had failed to succeed in his action against the hospital for a writ of mandate. *Id.* at 650–51. The holding in

*Mir* is thus inapposite to Pinhas's claim under the Sherman Act.

3. Nexus with Interstate Commerce

■ Appellees contend that Pinhas's amended complaint fails to establish jurisdiction under the Sherman Act because it does not sufficiently allege "a required nexus with interstate commerce." Appellees' primary contention is that interstate commerce will not be affected by the removal of Pinhas from the hospital staff.[6]

In order to establish jurisdiction under the Sherman Act, a plaintiff must "identify a relevant aspect of interstate commerce and then show 'as a matter of practical economics' that the Hospital's activities have a 'not insubstantial effect on the interstate commerce involved.' " *Mitchell v. Frank R. Howard Memorial Hosp.*, 853 F.2d 762, 764 (9th Cir.1988) (summarizing this circuit's interpretation of *McLain v. Real Estate Bd.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); quoting *Palmer v. Roosevelt Lake Log Owners Ass'n*, 651 F.2d 1289, 1291 (9th Cir.1981), *cert. denied*, —— U.S. ——, 109 S.Ct. 1123, 103 L.Ed.2d 186 (1989)).

Appellees do not contest the first consideration—they concede that the hospital is engaged in interstate commerce based on the out-of-state patients served and revenues received by the hospital. *See supra* note 6. Their argument is directed at the second consideration, the effect on the relevant interstate commerce. Under the second requirement, Pinhas must show that "as a matter of practical economics" the activities of the appellees—the peer review process in general—have'a "not insubstantial effect on the interstate commerce involved." *McLain*, 444 U.S. at 246, 100 S.Ct. at 511. Pinhas need not, as appellees apparently believe, make the more particularized showing of the effect on interstate commerce caused by the alleged conspiracy

---

**6.** They argue that any medical payments received by the hospital will not be materially affected by Pinhas's removal from the staff at Midway. Appellees contend that "[a]t most, the extent of interstate commerce affected by such a removal, would be the number of out-of-state patients currently served and/or the amount of out-of-state revenues currently received by appellee for services specifically related to eye care and ophthalmic surgery." Appellant's Brief at 25.

to keep him from working. *Id.* at 242–43, 100 S.Ct. at 509–10. He need only prove that peer-review proceedings have an effect on interstate commerce, a fact that can hardly be disputed. The proceedings affect the entire staff at Midway and thus affect the hospital's interstate commerce. Appellees' contention that Pinhas failed to allege a nexus with interstate commerce because the absence of Pinhas's services will not drastically affect the interstate commerce of Midway therefore misses the mark and must be rejected.

### 4. Injury to Competition

■ Appellees argue that Pinhas's complaint was properly dismissed because it fails to allege an adverse effect on competition; appellees contend that the entire thrust of Pinhas's allegation of antitrust damages in his complaint is that his own private medical practice was injured and that unfair procedures in the administrative hearings will restrict his ability to gain income from a hospital-based practice at Midway.

To maintain a successful antitrust action, Pinhas must show that the alleged conspiracy among the appellees did more than injure him; he must prove an injury to the competition in the relevant market. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Christofferson Dairy, Inc. v. MMM Sales, Inc.,* 849 F.2d 1168, 1172 (9th Cir.1988). Although the emphasis in determining whether an injury has occurred is properly on the injury to competition and not to the competitor, *see Ralph C. Wilson Indus. v. Chronicle Broadcasting Co.,* 794 F.2d 1359, 1363 (9th Cir.1986) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)), "injury to competitors may be probative of harm to competition," *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1040 (9th Cir.1988) *cert. granted,* —— U.S. ——, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989); *accord USA Petroleum Co. v. Atlantic Richfield Co.,* 859 F.2d 687, 696 (9th Cir.1988) (quoting *Hasbrouck* ), *cert. granted,* —— U.S. ——, 109 S.Ct. 2446, 104 L.Ed.2d 1001 (1989).

Pinhas alleges in his complaint that the conspiracy was intended to boycott his attempts at providing patients with lower prices as a result of his ability to perform operations at a rate quicker than that of his competitors. Assuming Pinhas's allegation that he provides his services at a rate cheaper than that of his competitors to be true, the preclusion of Pinhas from practicing could conceivably injure competition by allowing other similar doctors to charge higher prices for their services. Or Pinhas may show that his preclusion otherwise substantially reduced total competition in the market. We therefore conclude that Pinhas has adequately pleaded injury to competition.

### 5. Conspiracy

Finally, appellees contend that the amended complaint fails adequately to plead an antitrust conspiracy. Section 1 of the Sherman Act is directed at prohibiting unreasonable restraint of trade effected by a "contract, combination ... or conspiracy" among separate entities. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed. 2d 628 (1984). "The phrase 'contract, combination, or conspiracy' limits application of the Sherman Act to concerted conduct by more than one person or single entity." *Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1449 (9th Cir.1988).

■ Appellees contend that the dismissal of Weissburg & Aronson, and its principal, Mr. Kadzielski, should be affirmed because they were only acting as agents of Summit Health. An attorney is not immune from antitrust liability if he becomes an active participant in formulating policy decisions with his client to restrain competition. *See Tillamook Cheese and Dairy Ass'n v. Tillamook County Creamery Ass'n,* 358 F.2d 115, 118 (9th Cir.1966); *Brown v. Donco Enter., Inc.,* 783 F.2d 644, 647 (6th Cir. 1986) (per curiam). Pinhas sufficiently alleges in his complaint that Kadzielski, Weissburg & Aronson, and Posell exerted their influence over Summit Health and Midway so as to direct them to engage in

the complained of acts for an anticompetitive purpose.

■ Drs. Lurvey, Reader, Macy, Salz and Perlman are members of the medical staff at Midway. Any action taken by a medical staff satisfies the "contract, combination or conspiracy" requirement. *Weiss v. York Hosp.*, 745 F.2d 786, 814–17 (3rd Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).

Appellees apparently argue that Summit Health, as a parent of Midway, cannot "conspire" with Midway, and that Midway cannot "conspire" with the medical staff. *See Oltz*, 861 F.2d at 1449–50 (recognizing that a hospital and member of its medical staff may under certain circumstances constitute separate entities for purposes of adequately pleading a section 1 conspiracy); *but see Weiss*, 745 F.2d at 814–815. Pinhas alleges, however, that both entities conspired with Kadzielski, Weissburg & Aronson, and Posell, all outside agents of both Midway and Summit Health. Accordingly, Midway and Summit Health are not properly dismissed.

Finally, Feldman and Farber, as employees of Midway and/or Summit Health, cannot "conspire" with their employer corporations. *Id.* at 1450 (quoting *Copperweld*, 467 U.S. at 769, 104 S.Ct. at 2740). Again, however, Pinhas's complaint, read in the light most favorable to him, alleges that Feldman and Farber entered into an agreement with the other appellees. We therefore find the "conspiracy" requirement of section 1 of the Sherman Act satisfied as to each of the defendants. For the foregoing reasons, we reverse the dismissal of Pinhas's antitrust claim.

B. *Procedural Due Process Claim*

■ Pinhas alleges that the peer-review proceedings before the JRC violated his right to due process under the fourteenth amendment. The district court dismissed Pinhas's due process claim concluding that it did not meet the "state action" requirement.

The central inquiry in determining whether a private party's actions constitute "state action" under the fourteenth amendment is whether the party's actions may be "fairly attributable to the State". *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). To this end, the Court has followed a two-part analysis: "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.*

There is little doubt that the first prong under *Lugar* has been satisfied. Midway is required under California state law to include in its bylaws a mechanism by which a physician may appeal a hospital's decision to remove him from its staff. *See* Cal.Admin.Code tit. 22, § 70703(b). Additionally, the SDHS, in reviewing hospitals during the licensing process, looks to determine whether a functional, operating peer-review process is in place. The peer-review process is thus a rule of conduct imposed by the state of California within the meaning of *Lugar*.

Under the second prong in *Lugar*, Pinhas argues that the actions of those involved in the peer-review process should be construed as that of the state because of the statutorily created system of peer-review, which Pinhas argues, actively seeks to integrate private and public systems of review. State regulation of a private entity, however, is not enough to support a finding of state action. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982). Pinhas must show that "there is a sufficiently close nexus between the State

and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson,* 419 U.S. at 351, 95 S.Ct. at 453; *see also Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786. Additionally, a state may be held responsible for the action of a private party only when it "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.*

The challenged action here, the removal of Pinhas's staff privileges at Midway, cannot be attributed to the state of California. Only private actors were responsible for the decision to remove Pinhas. That the decision was made pursuant to a review process that has been approved by the state is of no consequence: the decision ultimately turned on the "judgments made by private parties according to professional standards that are not established by the State." *Blum,* 457 U.S. at 1008, 102 S.Ct. at 2788. Additionally, the fact that a hospital must forward to the BMQA an "805 report" whenever any adverse action is taken against a doctor is irrelevant in determining whether the state took an active role in removing Pinhas's privileges. *See id.* at 1009–10, 102 S.Ct. at 2788–89 (penalties imposed for violating regulation requiring nursing home officials to conduct periodic review of type of care necessary for each resident adds nothing to claim of state action). In short, Pinhas has failed to demonstrate that the state exercised coercive power or encouraged his removal in any way.

Pinhas also attempts to characterize the appellees as state actors by arguing that the "integration of public and private systems of peer review" meets the "symbiotic relationship" test set forth in *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Pinhas appears to argue that the state of California acts with those involved in the review proceedings as a "joint participant" in deciding whether a physician has been properly removed.

The relationship which exists between the state of California and those involved in the peer-review proceedings is far different than that which existed between the city of Wilmington and the lessee of the restaurant in the public parking garage in *Burton.* There is no financial relationship between the two, nor is any real property involved. This difference is sufficient to place this case out of the ambit of *Burton. See Jackson,* 419 U.S. at 357–58, 95 S.Ct. at 456–57 (limiting reach of *Burton* ); *Blum,* 457 U.S. at 1010–11, 102 S.Ct. at 2788–89(same).

Finally, we note that the Sixth and Seventh Circuits have also determined that a decision by a hospital to terminate or restrict the staff privileges of one of its physicians may not be attributed to the state for purpose of establishing state action under the fourteenth amendment. *See Ezpeleta v. Sisters of Mercy Health Corp.,* 800 F.2d 119, 122–23 (7th Cir.1986); *Crowder v. Conlan,* 740 F.2d 447, 451 (6th Cir. 1984). Because Pinhas's removal was instrumented solely by private parties, state action is absent and his due process claim was properly dismissed.

## C. *Declaratory Judgment*

The district court dismissed Pinhas's claim for a declaratory judgment because it was not ripe and the appellees had no interest in the enforcement of either the state or federal regulation and therefore were not the proper parties to defend the statutes.

We agree with the district court that the appellees are not the appropriate parties to defend a constitutional challenge to the relevant state and federal statutes. *See Jacobson v. Tahoe Regional Planning Agency,* 566 F.2d 1353, 1361 (9th Cir.1977) (dismissing claim for declaratory judgment against counties because counties' interest

in the ordinance challenged was purely ministerial),[7] *affirmed in part, reversed in part,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed. 2d 401 (1979).

## IV

## CONCLUSION

We reverse the dismissal of the antitrust claim and affirm the dismissal of the section 1983 claim and request for declaratory judgment. Each party shall bear its own costs on appeal.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

7. In *Jacobson,* the plaintiffs requested a declaratory judgment to preclude the enforcement of a land use ordinance enacted by the Tahoe Regional Planning Authority (TRPA). The court dismissed the claim for declaratory judgment against several counties in the Lake Tahoe Basin:

[T]he action against the counties was properly dismissed because the alleged infringement of constitutional rights arises from the action of the TRPA. The Compact limits the involvement of the counties to a sharing of the enforcement power with the cities, the states and the TRPA. Their involvement is purely ministerial, and thus peripheral to the allegations underlying this suit.
*Jacobson,* 566 F.2d at 1361.